<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

DUDLEY RUE,                          :
                                     :     Civil Action No. 09-1741 (AET)
               Petitioner,           :
                                     :
          v.                         :     **OPINION**
                                     :
DONALD MEE,                          :
                                     :
               Respondent.           :


**APPEARANCES:**

Petitioner <u>pro se</u>                    Counsel for Respondents
Dudley Rue                           Kathleen Masterson Petrucci
East Jersey State Prison             Mercer Co. Prosecutor's Ofc.
Lock Bag R                           Mercer County Court House
Rahway, NJ  07065                    P.O. Box 8068
                                     Trenton, NJ  08650

**THOMPSON,** District Judge

     Petitioner Dudley Rue, a prisoner currently confined at East

Jersey State Prison in Rahway, New Jersey, has submitted a

petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  The respondent is Donald Mee.

     For the reasons stated herein, the Petition must be denied.

I.   BACKGROUND

A.   Factual Background

The relevant facts are set forth in the opinion of the
Superior Court of New Jersey, Appellate Division.[1]

> The relevant facts of the case are essentially as
> follows:  The State presented evidence that the murder
> arose out of an altercation between Robert Lee Dodson,
> a/k/a "Silk," and the victim, Jeffrey Glanton, a/k/a
> "Newark," on East Hanover Street in Trenton.  Shinnette
> Williams, Harriette Stephens and Terrence Darnell
> Williams witnessed this event.  Dodson apparently
> thought that Glanton stole drugs and money from
> Dodson's girlfriend.  Dodson struck Glanton with an
> aluminum baseball bat.  Glanton grabbed the bat as it
> slipped out of Dodson's hands and then hit Dodson in
> the leg with it.  Dodson limped around the corner and
> placed a call from a pay phone and asked Terrence
> Williams to call "Bones" (Tyrone Williams) and tell him
> to "get over here" because he and Glanton were
> fighting.  Tyrone Williams said he would be over in ten
> minutes.
>
> Tyrone Williams soon appeared carrying a blue bag
> and asked where Glanton was.  Stephens then pointed him
> in Glanton's direction, at which time Tyrone Williams
> walked up to Glanton and hit him with his fist.  At
> this point, a blue Hyundai drove up and the occupants,
> four black men, jumped out at the same time and
> ambushed Glanton.  These men, each armed with handguns,
> used the guns to beat Glanton.  One of the assailants
> was identified as defendant.  Witnesses said Glanton
> was essentially defenseless and that his head was split
> "wide open" and was "pulsating" with blood "bubbling"
> at the top "like his head was about to explode."
> During the beating, one of the hand guns discharged,

_____

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding
instituted by an application for a writ of habeas corpus by a
person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be
presumed to be correct.  The applicant shall have the burden of
rebutting the presumption of correctness by clear and convincing
evidence."

apparently accidentally.  This, in turn, caught the attention of Trenton Police Officers Maldonado and Medina who were on routine patrol.  The assailants continued to beat Glanton until they saw the police car.  The assailants then scattered in different directions.

Defendant and Rory Bryson walked "very quickly" toward the unoccupied blue Hyundai.  Both "appeared to be very nervous."  Defendant had a gun in his left hand which was pointed at the ground.  Officer Maldonado informed his partner that defendant was armed and both officers alighted from their car.  Officer Maldonado grabbed Bryson before he could enter the Hyundai.  Bryson was in possession of an operable, unloaded Smith & Wesson .357 Magnum.  Defendant opened the passenger side door of the Hyundai, tossed a gun (a .38 caliber Smith & Wesson) inside, and fled with Officer Medina in pursuit.  Officer Medina caught defendant and arrested him.

Glanton died after surgery at Saint Francis Medical Center.  The autopsy disclosed that the cause of death was "extensive fractures of the skull, lacerations of the brain due to blunt trauma to the head."  The injuries to the skull included several fractures at the top as well as a "gaping hole" and a deep scalp laceration" at the base of the skull.  In the opinion of the medical examiner, such injuries would have required "innumerable blows" of "Massive force."  A forensic examination disclosed human blood on the gun which defendant discarded.

Defendant testified that he met with Bryson, Tyrone Williams, and Robert Williams to discuss a report that Dodson had been in a fight.  They decided to investigate the matter and "scare the guy up."  When Tyrone Williams left his mother's house, he brought a blue bag to the car that Bryson was driving.  Just before stopping at East State Street to pick up Dodson, Tyrone Williams handed out guns from the blue bag, commenting on whether or not each gun was loaded.  He then handed one to defendant, telling him to give it to Dodson, who was about to get into the back seat with defendant.

According to defendant, while Tyrone Williams walked to East Hanover Street, the others proceeded

3

there in the car.  Dodson directed Tyrone Williams to
Glanton, whow as standing in the street.  Because
defendant recognized Glanton as someone he had known
since childhood and regarded him as his "uncle,"
defendant told the others that they were "related" and
that they should not "mess with him."

Defendant claimed that he remained in the back
seat of the Hyundai, when the others got out.  The
initial altercation was between Tyrone Williams and
Glanton.  The others soon joined the fight, striking
Glanton on the head and shoulders with the guns.
Dodson's gun discharged.  When the police arrived,
Byrson and Tyrone Williams ran back to the Hyundai,
threw their guns inside, and told defendant to run.
Defendant states that he ran to East State Street and
was arrested outside of Dodson's apartment.

Defendant testified that until he recognized
Glanton, his only intention was "to scare the guy up."
Prior to the attack on Glanton, defendant stated that
he was unaware of anyone else's intention to kill or
injure Glanton.

State v. Rue, 296 N.J.Super. 108, 111-14 (N.J.Super. App. Div.

1996).

B.   Procedural History

On July 31, 1992, Petitioner was charged in Mercer County

Indictment, 92-07-0827-I, along with co-defendants Rory Bryson,

Robert Dodson, Robert Williams, and Tyrone Williams with first

degree murder in violation of N.J.S.A. 2C:11-3(a)(1), (2) and

N.J.S.A. 2C:2-6 (count one); second degree possession of a weapon

for an unlawful purpose in violation of N.J.S.A. 2C:39-4(a) and

N.J.S.A. 2C:2-6 (count two); third degree unlawful possession of

a weapon without a permit in violation of N.J.S.A. 2C:39-5(b)

(count three); and third degree possession of cocaine in

violation of N.J.S.A. 2C:35-10(a)(1) and N.J.S.A. 2C:2-6 (count four).

Beginning March 8, 1994, Petitioner was tried alone, to a jury, and was convicted of counts one, two, and three.  The trial court merged the conviction for the offense of possession of a weapon for an unlawful purpose into the murder conviction and, on April 29, 1994, sentenced Petitioner to a custodial term of 30 years with no parole eligibility.  On the weapons permit conviction, the trial court sentenced Petitioner to a concurrent custodial term of four years.  On direct appeal, the Superior Court of New Jersey, Appellate Division, affirmed.  State v. Rue, 296 N.J. Super. 108 (N.J.Super. App. Div. 1996).  The Supreme Court of New Jersey denied certification.  State v. Rue, 148 N.J. 463 (1997).

Petitioner filed his first state petition for post-conviction relief on July 24, 1993, which the trial court denied.  However, the Appellate Division reversed and remanded the matter back to the trial court.  The Supreme Court of New Jersey granted certification and affirmed the decision of the Appellate Division.  State v. Rue, 175 N.J. 1 (2002).

With the assistance of retained counsel, Petitioner then filed a second PCR petition, which was treated as a first petition, pursuant to the instructions of the Appellate Division. The trial court denied the PCR petition, and the Appellate

5

Division affirmed the denial of relief.  State v. Rue, 2008 WL 3850849 (N.J.Super. App. Div. Aug. 19, 2008).  The Supreme Court of New Jersey denied certification.  State v. Rue, 966 A.2d 1077 (Table), 2009 WL 800092 (Feb. 4, 2009).

This Petition followed.  Here, Petitioner attacks his conviction on the following grounds:  (1) evidential insufficiency, (2) faulty jury instructions, (3) denial of his right to a speedy trial, (4) denial of compulsory process, and (5) ineffective assistance of trial counsel.  Respondent has answered, conceding that all claims were exhausted in state court; this matter is now ready for decision.

## II.   28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

> With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an "unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter). Id. at 407-09. To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409. In determining whether the state court's application

7

of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference. Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)). With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment. See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000). See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits

notwithstanding the petitioner's failure to exhaust his state court remedies.  See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

### III.   ANALYSIS

A.   Speed Trial

Petitioner contends that he was denied his right to a speedy trial and that the delay caused a defense witness, co-defendant Robert Dodson, to be unavailable, as he had been transferred to Virginia to face criminal charges there.

The Appellate Division summarily rejected this claim on direct appeal.

The Sixth Amendment provides, in pertinent part, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ... ."  U.S. Const. amend. VI.  The right

to a speedy trial is "fundamental" and is imposed on the states
by the Due Process Clause of the Fourteenth Amendment.  Kloper v.
North Carolina, 386 U.S. 213, 223 (1967).  See also Barker v.
Wingo, 407 U.S. 514 (1972).  In Barker, the Supreme Court set
forth four factors to be weighed and balanced to determine
whether the Sixth Amendment's guarantee of a speedy trial has
been violated:  (1) the length of the delay; (2) the reason for
the delay; (3) whether, in due course, the defendant asserted his
right to a speedy trial; and (4) the prejudice to the defendant.
See id. at 530; see also United States v. Dent, 149 F.3d 180, 184
(3d Cir. 1998), cert. denied, Dent v. United States, 525 U.S.
1085 (1999).

> The first of these is actually a double enquiry.
> Simply to trigger a speedy trial analysis, an accused
> must allege that the interval between accusation and
> trial has crossed the threshold dividing ordinary from
> "presumptively prejudicial" delay, since, by
> definition, he cannot complain that the government has
> denied him a "speedy" trial if it has, in fact,
> prosecuted his case with customary promptness.  If the
> accused makes this showing, the court must then
> consider, as one factor among several, the extent to
> which the delay stretches beyond the bare minimum
> needed to trigger judicial examination of the claim.
> This latter enquiry is significant to the speedy trial
> analysis because, as we discuss below, the presumption
> that pretrial delay has prejudiced the accused
> intensifies over time.  In this case, the extraordinary
> 8 1/2 year lag between Doggett's indictment and arrest
> clearly suffices to trigger the speedy trial
> enquiry;[FN1] its further significance within that
> enquiry will be dealt with later.
>
>> [FN1]  Depending on the nature of the charges, the
>> lower courts have generally found postaccusation
>> delay "presumptively prejudicial" at least as it

10

> approaches one year.  We note that, as the term is
> used in this threshold context, "presumptive
> prejudice" does not necessarily indicate a
> statistical probability of prejudice; it simply
> marks the point at which courts deem the delay
> unreasonable enough to trigger the <u>Barker</u> enquiry.

<u>Doggett v. United States</u>, 505 U.S. 647, 651-52 (1992) (citations omitted).

Here, there was a lapse of just over 19 months between indictment and the start of Petitioner's trial, sufficient to trigger the <u>Barker</u> analysis.  In addition, Petitioner asserted his speedy trial claim before trial.  However, the reasons for the delay were reasonable, and Petitioner has not been able to point to any prejudice as a result of the delay.

More specifically, on October 26, 1993, Judge DeMartin heard Petitioner's motion to set a trial date.[2]  At the hearing, the prosecutor advised the court that the delay to that point had resulted from a backlog of other murder cases that had to be tried.  Judge DeMartin ordered that Petitioner's case be tried within 90 days of October 8, 1993, a period that expired on January 7, 1994.  On January 11, 1994, Petitioner moved to dismiss the indictment on speedy trial grounds.

At the hearing on this motion, the same day, the prosecutor explained to the court the events that had transpired between

---

[2] Counsel represented to the court that they were not contesting delays prior to October 8, 1993, during which period Petitioner's co-defendants were tried separately.

11

October 26, 1993, and January 11, 1994, to further delay
Petitioner's trial.  Immediately after the order, the assigned
judge tried an older homicide case that lasted approximately two
weeks.  During that trial the assigned judge was diagnosed with
cancer; notwithstanding his cancer diagnosis the assigned judge
scheduled Petitioner's trial to begin immediately following
another trial scheduled to start immediately after Thanksgiving.
Shortly thereafter, the prosecutor learned that one of his police
witnesses would be on vacation and, at the same time, the trial
judge indicated to counsel that he was experiencing some
discomfort and would not start a lengthy trial that he might not
be able to finish and that might end in a mistrial.  On Monday,
December 20, 1993, the prosecutor asked the presiding judge for
the criminal part to reassign Petitioner's case as soon as
practicable.  The matter was reassigned to another judge who was
then trying a child sexual abuse trial.  On January 3, 1994,
Judge Smithson began pretrial matters in Petitioner's case, with
a view toward beginning trial immediately upon conclusion of the
pending child sexual abuse case.

     At the hearing on January 11, 1994, the presiding judge
found that there had been substantial compliance with the prior
order to commence the trial within 90 days and he denied the
motion to dismiss the indictment.  Immediately thereafter,
counsel for Petitioner moved for an extension of time to procure

the out-of-state witness and advised the court that Petitioner would waive any speedy-trial claim arising from future delays for the purpose of procuring the out-of-state witness.[3]

The state courts' determination that Petitioner's speedy trial rights were not violated is neither contrary to nor an unreasonable application of the governing Supreme Court caselaw. Petitioner is not entitled to relief on this claim. The short delay occasioned by the need to reassign Petitioner's case because of a judge's cancer diagnosis was not unreasonable. Nor can Petitioner point to any prejudice to his defense arising from the delay. He could have procured the presence of his incarcerated out-of-state witness through the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings, commonly known as the "Interstate Compact," which has been adopted in both New Jersey, N.J.S.A. 2A:81-18 et seq., and Virginia, Virginia Code 1950, §§ 19.2-272 to 19.2-282), where Dodson was incarcerated. Petitioner is not entitled to relief on this claim.

B.   Right to Compulsory Process

Petitioner alleges that the State made Robert Dodson unavailable, and then denied him compulsory process to bring him back to New Jersey from Virginia.

---

[3] The presiding judge hearing the speedy-trial motion declined to rule on this request and advised Petitioner's counsel to make the motion to the trial judge.

The Appellate Division summarily rejected this claim on direct appeal.

As noted above, when Petitioner's speedy-trial motion was denied on January 11, 1994, he immediately requested a delay in order to procure the attendance of an incarcerated out-of-state witness.  Petitioner thereafter made the motion to the trial judge, who entered an order on January 21, 1994, adjourning the trial date to March 7, 1994, so that Petitioner could procure this witness.  Nevertheless, Petitioner did not call Robert Dodson as a witness in his defense.

Pursuant to the Sixth Amendment, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor."

"The main and essential purpose of confrontation is <u>to secure for the opponent the opportunity of cross-examination</u>." <u>Davis v. Alaska</u>, 415 U.S. 308, 315-16 (1974) (emphasis in original).  However, "'state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.'"  <u>Homes v. South Carolina</u>, 126 S.Ct. 1727, 1731 (2006) (quoting <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998); also citing <u>Crane v. Kentucky</u>, 476 U.S. 683, 689-690 (1986); <u>Marshall v. Lonberger</u>, 459 U.S. 422, 438, n.

14

6 (1983); <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302-303 (1973);

<u>Spencer v. Texas</u>, 385 U.S. 554, 564 (1967)).

> This latitude, however, has limits.  "Whether rooted
> directly in the Due Process Clause of the Fourteenth
> Amendment or in the Compulsory Process or Confrontation
> clauses of the Sixth Amendment, the Constitution
> guarantees criminal defendants 'a meaningful
> opportunity to present a complete defense.'" <u>Crane</u>,
> <u>supra</u>, at 690, 106 S.Ct. 2142 (quoting <u>California v.
> Trombetta</u>, 467 U.S. 479, 485, 104 S.Ct. 2528, 81
> L.Ed.2d 413 (1984); citations omitted).  This right is
> abridged by evidence rules that "infring[e] upon a
> weighty interest of the accused" and are "'arbitrary'
> or 'disproportionate to the purposes they are designed
> to serve.'" <u>Scheffer</u>, <u>supra</u>, at 308, 118 S.Ct. 1261
> (quoting <u>Rock v. Arkansas</u>, 483 U.S. 44, 58, 56, 107
> S.Ct. 2704, 97 L.Ed.2d 37 (1987)).
>
> ...
>
> While the Constitution thus prohibits the
> exclusion of defense evidence under rules that serve no
> legitimate purpose or that are disproportionate to the
> ends that they are asserted to promote, well-
> established rules of evidence permit trial judges to
> exclude evidence if its probative value is outweighed
> by certain other factors such as unfair prejudice,
> confusion of the issues, or potential to mislead the
> jury. ...  Plainly referring to rules of this type, we
> have stated that the Constitution permits judges "to
> exclude evidence that is 'repetitive ..., only
> marginally relevant' or poses an undue risk of
> 'harassment, prejudice, [or] confusion of the issues.'"
> <u>Crane</u>, <u>supra</u>, at 689-690, 106 S.Ct. 2142 (quoting
> <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679, 106 S.Ct.
> 1431, 89 L.Ed.2d 674 (1986); ellipsis and brackets in
> original).  <u>See also</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37,
> 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality
> opinion) (terming such rules "familiar and
> unquestionably constitutional").

<u>Homes v. South Carolina</u>, 126 S.Ct. at 1731-33 (citations

omitted).

Violations of the right to present a defense are subject to harmless error review.  <u>See</u>, <u>e.g.</u>, <u>Crane v. Kentucky</u>, 476 U.S. 683 (1986); <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 680-84 (1986); <u>Savage v. District Attorney of the County of Philadelphia</u>, 116 Fed.Appx. 332 (3d Cir. 2004) (unpubl.).

> The Compulsory Process clause protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling by the trial judge. [footnote] ...

> But the right is not absolute.  The Sixth Amendment requires more than a mere showing by the accused that some relevant evidence was excluded from his trial.  Rather, the accused must show how that testimony would have been both <u>material</u> and <u>favorable</u> to his defense. ... [E]vidence is material: "only if there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." ...  In [<u>United States v. </u>]<u>Bagley</u>, [473 U.S. 667 (1985), ]the Court further refined the materiality definition by noting that, "[a] 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Bagley</u>, 473 U.S. at 682, 105 S.Ct. at 3383.

> In sum, for [a defendant] to establish that he was convicted in violation of his Sixth Amendment right to compulsory process, he must show: First, that he was deprived of the opportunity to present evidence in his favor; second, that the excluded testimony would have been material and favorable to his defense; and third, that the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose. <u>Rock v. Arkansas</u>, 483 U.S. 44, 56, 107 S.Ct. 2704, 2711, 97 L.Ed.2d 37 (1987).

<u>Government of the Virgin Islands v. Mills</u>, 956 F.2d 443, 445-46 (3d Cir. 1992) (footnote omitted).  The Court of Appeals noted that some courts analyze such claims under the Due Process Clause

and that there is little, if any, difference in the analysis. <u>Mills</u>, 956 F.2d at 445 n.4.

Here, Petitioner has failed to demonstrate that the government in any way deprived him of the opportunity to call Robert Dodson as a defense witness. To the contrary, the trial was delayed to permit Petitioner to secure the presence of Dodson through the Interstate Compact. More importantly, Petitioner has failed to make any showing, here or in the state courts, that Dodson would have provided testimony that would have been material and favorable to his defense. Petitioner is not entitled to relief on this claim.

C.  <u>Sufficiency of the Evidence</u>

Petitioner alleges that there was not sufficient evidence to sustain the conviction against him. He alleges that the two "key" witnesses against him were two neighborhood crack-addicted prostitutes, Shinnette Williams and Harriette Stephens. Plaintiff alleges that these two witnesses testified only to what the group of co-defendants did, but not as to what he, specifically, did. He contends that these two witnesses can only place Petitioner at the scene of the crime, a fact which he does not contest.

The Appellate Division summarily rejected this claim on direct appeal.

A claim that the jury's verdict was against the weight of the evidence raises a due process concern. Only where, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" should the writ issue. Jackson v. Virginia, 443 U.S. 307, 319 (1979). This standard must be applied "with explicit reference to the elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324, n.16. See also Orban v. Vaughn, 123 F.3d 727 (3d Cir. 1997), cert. denied, 522 U.S. 1059 (1998). As noted above, state court factual determinations are presumed to be correct. See Werts v. Vaughn, 228 F.3d 178, 186 (3d Cir. 2000).

Contrary to Petitioner's characterization of the evidence at trial, there is no evidence that the witnesses Shennette Williams or Harriette Stephens are crack cocaine addicts or that they were impaired in their observations by any drug use at the time of the murder. Both witnesses had known Petitioner for years and there is no suggestion that they were not able to competently identify him. Moreover, they testified that he left the car and participated in the beating. In addition, two police officers testified that they saw Petitioner walking very quickly from the site of the beating to the car, holding a firearm, and that they

18

saw him toss the firearm into the car.  Human blood was found on Petitioner's jacket and the gun he tossed into the car.

The state courts' determination that the evidence was sufficient to sustain the conviction is neither contrary to nor an unreasonable application of Supreme Court law, nor is the state court's determination unreasonable in light of the evidence.  Petitioner is not entitled to relief on this claim.

D.   <u>Jury Instructions</u>

Petitioner alleges that the jury instructions were flawed in that the trial court did not instruct the jury that Petitioner could have been found guilty, as an accomplice, of a lesser degree of homicide than his co-defendants.[4]  <u>See</u> <u>State v. Bielkiewicz</u>, 267 N.J.Super. 520 (N.J.Super. App. Div. 1993).

The Appellate Division rejected this claim on direct appeal.

> Defendant now argues for the first time that the accomplice charge given by the judge was erroneous.  In light of his failure to object to the instruction, any error in it should be disregarded by us unless it was clearly capable of producing an unjust result.  R. 2:10-2.  <u>State v. Cofield</u>, 127 N.J. 328, 341, 605 A.2d 230 (1992).

> The state concedes that the jury was "not specifically instructed that in a homicide prosecution,

---

[4] As noted earlier, Petitioner was tried alone.  Co-defendant Rory Bryson was convicted of being an accomplice to first degree purposeful or knowing murder and for unlawful possession of a handgun without a permit.  Co-defendant Robert Dodson pleaded guilty to aggravated manslaughter.  Co-defendant Robert Williams also pleaded guilty to aggravated manslaughter.  The disposition of co-defendant Tyrone Williams is unknown.  <u>See</u> <u>State v. Rue</u>, 296 N.J.Super. at 110, n.1.

even though the principal had committed purposeful or
knowing murder, the accomplice [can] be found guilty of
a lesser offense involving recklessness (i.e.,
aggravated or reckless manslaughter) if he intended
that an assault be committed upon the victim but did
not share the principal's intent that the assault cause
death or serious bodily injury." It is thus
unnecessary to set forth the trial judge's instruction
in detail. It falls to us to determine whether, on the
facts of the case, the trial judge's omission could
have led the jury astray. We think not.

Defendant's argument is based on State v.
Bielkiewicz, supra. In that case, the victim, a tow
truck driver was removing unauthorized cars from a
restaurant parking lot. As a result, an altercation
with Jermaine Pitts ensued. The victim was winning the
fight when Bielkiewicz and anther person came to Pitts'
assistance. The victim ran and Pitts shot him in the
back. We held, that on those facts, it was plain error
not to explain to the jury that:

> [I]t could find one defendant guilty of murder as
> a principal and the other defendant guilty of
> aggravated manslaughter, manslaughter or assault
> as an accomplice. Indeed, the court implied the
> contrary when it told the jury that "one cannot be
> held as an accomplice unless you find as a fact
> that he shared the same purpose required to be
> proven against the person who actually committed
> the act."

[Bielkiewicz, supra, 267 N.J.Super. at 531, 632 A.2d
277 (footnote omitted).]

In Bielkiewicz, the jury, as here, had questions
regarding accomplice liability. The judge in
Bielkiewicz, like this judge, gave a supplemental
instruction in response to the jury's question.
However, both the instruction in Bielkiewicz and in
this case omitted telling the jury that it could find
the principal guilty of murder and the accomplice
guilty of a lesser offense. id. at 533, 632 A.2d 277.
We held:

> The court did not inform the jury that it could
> conclude, in accordance with Bridges, that even
> though the principal had committed purposeful or

20

knowing murder, the accomplice could be found
guilty of a lesser offense involving recklessness
if he intended that an assault be committed upon
[the victim] but did not share the principal's
intent that that assault cause death or serious
bodily injury.

[Id. at 533, 632 A.2d 277 (citations omitted).]

The difference between this case and Bielkiewicz
is that the evidence in this case could have supported
a finding that defendant Bielkiewicz did not share
Pitts' homicidal state of mind.  A jury could
reasonably have concluded from his actions that
Bielkiewicz was intent on inflicting bodily injury on
the victim to help Pitts win the fight, but that he did
not share Pitts' intent to cause death or serious
bodily injury.  That is not the case here.  The parties
presented the jury with two scenarios.  The first was
the state's version that defendant himself participated
in the vicious beating of the victim which caused the
death.  The second was that defendant remained in the
car and did not participate at all in the crime.
Neither of those versions warranted a Bielkiewicz
charge, the former because defendant's culpability was
as a principal; the latter because defendant was not
guilty of a crime at all.

Defense counsel suggests that the jury could have
pieced together a third scenario and that that scenario
compelled a Bielkiewicz instruction.  The defense
posits that a jury could conclude that defendant
participated in the beating with the intention to
"scare the victim up" and not to kill him, based on
defendant's statement (albeit out of context) to that
effect.  The problem with this suggestion is two fold;
first there is absolutely no evidence whatsoever from
which a jury, once having identified defendant as an
actual participant in the beating of Glanton, could
differentiate between his culpability and that of the
other perpetrators of this crime.  For example,
defendant was not hitting the victim with his fists
while the others were using steel weapons, nor was he
hanging back while the others were enthusiastically
striking the victim with their guns.  He did what they
did.

21

Second, and more important, a defendant's state of
mind at the inception of a criminal act is subject to
change.  Thus, even if defendant began beating Glanton
with the intention of scaring him, his continued
striking of Glanton's skull, which was split open and
pulsating with blood therefore evidencing a
catastrophic injury, revealed nothing less than an
intention to cause him serious bodily injury or death.
In short, on the evidence presented, once having
rejected defendant's claim of non-complicity, that jury
could not have concluded that defendant had the mental
state for a lesser crime than that of the other
participants.  As such, the trial judge's instruction
was not erroneous under <u>Bielkiewicz</u>.

<u>State v. Rue</u>, 296 N.J.Super. at 114-16.

Generally, a jury instruction that is inconsistent with

state law does not merit federal habeas relief.  Where a federal

habeas petitioner challenges jury instructions given in a state

criminal proceeding,

[t]he only question for us is "whether the ailing
instruction by itself so infected the entire trial that
the resulting conviction violates due process."  It is
well established that the instruction "may not be
judged in artificial isolation," but must be considered
in the context of the instructions as a whole and the
trial record.  In addition, in reviewing an ambiguous
instruction ..., we inquire "whether there is a
reasonable likelihood that the jury has applied the
challenged instruction in a way" that violates the
Constitution.  And we also bear in mind our previous
admonition that we "have defined the category of
infractions that violate 'fundamental fairness' very
narrowly."  "Beyond the specific guarantees enumerated
in the Bill of Rights, the Due Process Clause has
limited operation."

<u>Estelle v. McGuire</u>, 502 U.S. 62, 72-73 (1991) (citations

omitted).  Thus, the Due Process Clause is violated only where

"the erroneous instructions have operated to lift the burden of

proof on an essential element of an offense as defined by state law." Smith v. Horn, 120 F.3d 400, 416 (1997). See also Waddington v. Sarausad, 129 S.Ct. 823, 831-32 (2009) (to prevail in a jury-instruction challenge, a petitioner must establish both that the instruction was ambiguous, inconsistent, or deficient, and that there is a reasonable likelihood that the jury applied the instruction in a manner that relieved the state of its burden to prove every element of the crime beyond a reasonable doubt); In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).

Where such a constitutional error has occurred, it generally is subject to "harmless error" analysis. Smith v. Horn, 120 F.3d at 416-17; Neder v. United States, 527 U.S. 1, 8-11 (1999). "[I]f the [federal habeas] court concludes from the record that the error had a 'substantial and injurious effect or influence' on the verdict, or if it is in 'grave doubt' whether that is so, the error cannot be deemed harmless." Id. at 418 (citing

California v. Roy, 519 U.S. 2, 5 (1996)).  In evaluating a challenged instruction,

> a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.  If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

Middleton v. McNeil, 541 U.S. 433, 437 (2004) (internal quotations and citations omitted).

However, a jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden [of proof beyond a reasonable doubt] is plainly inconsistent with the constitutionally rooted presumption of innocence."  Cool v. United States, 409 U.S. 100, 104 (1972).  "[T]rial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires."  Victor v. Nebraska, 511 U.S. 1, 22 (1994); see also Cage v. Louisiana, 498 U.S. 39, 41 (1990).  As the Supreme Court explained in Victor,

> so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.  Rather, taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.

Victor, 511 U.S. at 6 (citations and internal quotation marks omitted).

"[A] misdescription of the burden of proof ... vitiates <u>all</u> the jury's findings. <u>Sullivan v. Louisiana</u>, 508 U.S. 275, 281 (1993) (emphasis in original). Such an error is considered structural and thus is not subject to harmless error review. <u>See id.</u> at 280-82. <u>But see</u> <u>Neder v. United States</u>, 527 U.S. 1, 8-11 (1999) (applying harmless-error analysis where jury was not instructed on an element of an offense).

Here, the state courts found that there was no error of state law. Nor has Petitioner established that the failure to give a <u>Bielkiewicz</u> charge, in the circumstances of this case, relieved the state of its burden to prove the elements of murder beyond a reasonable doubt. The state courts' decision was neither contrary to nor an unreasonable application of governing Supreme Court law. Petitioner is not entitled to relief on this claim.

E.   <u>Assistance of Counsel</u>

Petitioner alleges that he was denied the effective assistance of trial counsel as counsel failed to procure the appearance of Robert Dodson, failed to obtain the testimony from co-defendant Bryson's trial that Petitioner had remained in the car, failed to obtain exculpatory testimony from co-defendant Robert Williams and character testimony from other witnesses, and failed to question Shinnette Williams and William Shaw about

their inconsistent statements.  Petitioner also challenges counsel's failure to object to the deficient jury instructions.

The trial court denied relief when Petitioner raised these claims in his state petition for post-conviction relief.

> In the instant case, petitioner alleges that he received ineffective assistance of trial counsel.  ...

> In Order for the court to grant an evidentiary hearing the petitioner must establish a prima facie case of ineffective assistance of counsel.  To do so, a defendant must demonstrate the reasonable likelihood of success under the two prong test set forth in Strickland v. Washington, 46 U.S. 668, 687-90 (1984). A defendant must satisfy both prongs of this test to prevail.  See, State v. Fritz, 105 N.J. 42 (1987).

> Specifically, to demonstrate ineffective assistance of counsel:

>> "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction .... resulted from a breakdown in the adversary process that renders the rsult unreliable."

> State v. Savage, 120 N.J. 594 (1990) citing Strickland v. Washington, supra, 46 U.S. at 687-90.

> Under the first prong of the test, counsel is presumed to have made all significant decisions in the "exercise of reasonable professional judgment." Strickland, supra at 690.  "Judicial scrutiny of counsel's performance must be highly deferential...  [A court] must avoid sec ond-guessing defense counsel's tactical decisions and viewing those decisions under

26

the 'distorting effects of hindsight.'"  State v.
Marshall, 148 N.J. 89, 157 (1997), quoting Strickland.

Petitioner's application advances six grounds for
relief; all of which are without merit.

I.    Failure to Impeach State Witnesses

Petitioner argues that his trial counsel was
ineffective for failing to impeach the State's
witnesses, Shinette Williams and Harriette Stephens.
Both women gave damaging statements to the police
shortly after the incident implicating petitioner in
the beating of the victim.  After the trial of co-
defendant, Rory Bryson, Shinette Williams changed her
story and gave a sworn affidavit, dated November 4,
1993, exonerating petitioner.  The circumstances
surrounding the making of the affidavit by Ms. Williams
are unknown to the court and were not explained by
defense counsel at oral argument, however, both women
testified at trial consistent with their post-incident
statements.  In his PCR, petitioner asserts that at the
time of his trial the affidavit made by Ms. Williams
was available to trial counsel but was not used by him
to impeach Ms. Williams' credibility.  In addition,
petitioner asserts that both Ms. Williams and Stephens
were admitted crack users, yet trial counsel did not
attempt to show they faced prosecution and jail time.

a.    Shinette Williams' Affidavit

Ms. Williams' statement to the police dated March
11, 1992 provided detailed and specific information
regarding the events of March 10, 1992.  She stated
that four men got out of the blue Hyundai and joined
Tyrone Williams in the assault.  She identified
photographs depicting the four men (Dudley Rue, Rory
Bryson, Robert Williams and Robert Dodson).  However,
some twenty months later Ms. Williams provided an
affidavit asserting that at the time she made her
statement to the police in 1992 she was scared and
confused.  Substantively she stated that petitioner Rue
did not participate in the beating of the victim, but
rather sat in the back seat of the blue Hyundai during
the incident.  Nonetheless, Ms. Williams' testimony at
petitioner's trial was consistent with the damaging
statement she initially made to the police.

Ms. Williams' statement to the police, made the day after the assault, was made while the incident was still fresh in her mind.  There is nothing in the record to suggest that it was not made voluntarily, or free from undue influence.  The statement is detailed factually and is consistent with other available evidence.  Petitioner asserts that the claimed trial error in failing to impeach Ms. Williams' testimony with her affidavit of November 4, 1993 satisfies both prongs of the <u>Strickland</u> test constituting ineffective assistance of counsel.  This court disagrees.  Neither prong of <u>Strickland</u> has been met.

The affidavit, as presented in this petition, is suspect.  While it may be said that it speaks for itself, its origin presents a mystery.  Nothing has been advanced by petitioner as to the genesis of the affidavit.  Who initiated the taking of it?  Who prepared it?  What inducements or threats, if any were made?  The record is silent.  And, there is nothing before this court to suggest that trial counsel knew any of these simple but potentially devastating inquiries.  The reverse side is also noteworthy as trial counsel may have had knowledge of the manner in which the affidavit came about – and wisely chose to avoid opening that door before the jury.

The existence of the affidavit is but one element in assessing trial counsel's performance.  It does not come close to providing an answer as to whether there was trial advocacy deficiency.  Petitioner has the burden to make such a showing and it simply was not done.

Notwithstanding the foregoing and assuming, arguendo, that the decision not to use the affidavit was a serious error, this court is not satisfied that an adequate showing has been made that petitioner was deprived of a fair trial whose result is reliable.  Ms. Williams' testimony is seen to be cumulative and, at best, it would have been nullified.  There is nothing in the record to suspect that Ms. Williams would have acknowledged the affidavit as truthful.  Consequently, the verdict would have been the same and it would have been reliable as a product of evidence before the jury that placed petitioner in the thick of things as a participant.

b.   Jail Time and Allegedly Admitted Crack Use

Petitioner asserts ineffective assistance of counsel based on his belief that his attorney failed to impeach Ms. Williams and Ms. Stephens by showing that they were admitted crack cocaine users and that they faced prosecution and jail time for such crack use. Petitioner, however, fails to provide any evidence to support this claim of drug use. The record before the court is bare of any substantiation whatsoever. Secondly, the contention that Ms. Williams and Ms. Stephens faced criminal charges based on the claim of admitted crack use is without foundation. Simply stated, it is speculative and conclusionary and falls far short of meeting petitioner's burden of proof to establish ineffective assistance of counsel.

II.  Failure to Investigate and Present Evidence in
     Support of Defense of Lack of Motive

Petitioner alleges that the trial counsel was ineffective because he failed to introduce evidence regarding petitioner's alleged relationship to the victim which, in turn, would support the "defense" of lack of motive.

Petitioner was charged with first degree murder in violation of N.J.S.A. 2C:11-3a(1) and (2), which states, in pertinent part:

"Criminal homicide constitutes murder when: (1) the actor purposely causes death or serious bodily injury resulting in death, or (2) the actor knowingly causes death or serious bodily injury resulting in death."

In order for the jury to find a defendant guilty of murder, the State must prove beyond a reasonable doubt that defendant caused the victim's death or serious bodily injury that then resulted in the victim's death, and that defendant did so purposely or knowingly. The State does not have to prove motive. If the State has proved the essential elements of the offense beyond a reasonable doubt, defendant must be found guilty of that offense regardless of the defendant's motive or lack of motive.

29

Had trial counsel developed the lack of motive defense, it would not have changed the outcome of the trial given the fact that the State successfully proved the elements of murder beyond a reasonable doubt.  It is apparent that the trial counsel's decision not to develop the issue of lack of motive was a strategic one and does not give rise to an evidentiary hearing.

III.  Failure to Introduce Character Evidence of the Accused

Petitioner asserts that trial counsel was ineffective because he failed to introduce character evidence, in the form of character witnesses, to testify to petitioner's law-abiding and peaceful character.  Petitioner supports this claim by submitting affidavits made in 2005 and 2006 by various individuals attesting to petitioner's good character and stating they had been willing to testify at petitioner's trial had they been called.

It is not known whether trial counsel knew of the existence of the character witnesses at the time of the trial who would have allegedly testified to petitioner's good character, given that their statements were made in 2005 and 2006.  Assuming that trial counsel knew of the existence of these witnesses, it is likely that the trial counsel's decision not to present character evidence of petitioner's law-abiding and peaceful character was a strategic decision made in order to avoid the presentation of petitioner's bad character by the prosecution.  In such case, the strategic decision not to call witnesses to testify to petitioner's good character does not constitute ineffective assistance of counsel.

IV.  Newly Acquired Evidence

Petitioner alleges that newly discovered evidence in the form of potential testimony from Tyrone Williams, a co-defendant, would have exculpated him. To support this contention, petitioner presented a statement made by Tyrone Williams on October 26, 2005. This statement details the events of March 10, 1992 and exonerates petitioner by asserting that he remained in the car during the altercation with the victim.  It also states that after the police arrived, petitioner jumped out of the car and took off.

30

Williams was a fugitive at the time of petitioner's trial, therefore, it was not possible for the trial counsel to call him as a witness. Additionally, Williams made a statement in 1999 to a defense investigator retained by William Anklowicz, Esq. petitioner's first PCR counsel. Williams then stated that petitioner was the youngest of the group and may have been influenced by the others. Moreover, Williams further stated that petitioner was "indirectly involved because everyone was accountable for being in the car at the time."

The court in State v. Carter, 85 N.J. 300, 314 (1981) stated that "to qualify as newly discovered evidence entitling a party to a new trial, the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted."

In the present case, Williams' statement of October 26, 2005, does not rise to the level of newly discovered evidence. Williams's first statement, made to Mr. Anklowicz's investigator implicated petitioner in the murder. In his later statement, Williams contradicts himself by saying that petitioner did not participate in the beating. In addition, the materiality of the statement is questionable as other evidence exculpating petitioner was available at the time of the trial – e.g. a statement by Dudley Rue signed by Robert Williams and Rory Bryson and a statement made on the stand by Rory Bryson at his own trial and an affidavit by Mr. Bryson, dated February 22, 1993, to the same effect.

V.    Failure to Call Robert Williams, Rory Bryson and Robert Dodson as Witnesses for Defense

Petitioner argues that trial counsel was ineffective because he failed to call the above individuals as witnesses at trial. Robert Williams provided a statement to the police on March 12, 1992 implicating petitioner in the assault. Rory Bryson provided a statement to the police on March 10, 1992 stating that petitioner participated in the beating. Robert Dodson made a statement to the police on March

21, 1992 implicating petitioner, initially referring to
Mr. Rue as "X" and later identifying "X" as Dudley Rue.
Mr. Dodson gave a sworn statement on February 22, 1993
exonerating petitioner.

At the time of the trial, trial counsel was aware
of the statement made by petitioner and signed by Mr.
Williams and Mr. Bryson exonerating him.  In addition,
given the date of Mr. Dodson's statement exonerating
petitioner (February 22, 1993) and lack of a claim of
newly discovered evidence with respect to this
statement, it is presumed that trial counsel was aware
of its existence at trial.  Based on the fact that the
three witnesses changed their story regarding
petitioner's involvement in the assault, it is again
most likely that the trial counsel made a strategic
decision not to call them as witnesses at trial, as it
was difficult to predict their prospective testimony.
In order to avoid the possibility of damaging testimony
from Mr. Williams and Mr. Bryson, it is likely that the
trial counsel's strategy was not to call them at all.
Accordingly, petitioner fails to establish the first
prong of <u>Strickland</u> for ineffective assistance of
counsel.

VI.  Failure to Call William Shaw as a Witness for the
     Defense

Petitioner claims ineffective assistance of
counsel based on trial counsel's failure to call
William Shaw as a witness at trial.  Petitioner
attached an undated affidavit of William Shaw
exonerating him.  In his statement to the police Mr.
Shaw indicated that on March 10, 1992, a man [Dodson]
approached the victim and punched the victim in the
face.  At this time four or five guys armed with
handguns ran up to the victim and began beating him.
Shaw's account of events implicates petitioner in the
crime.  At the time of the incident, total of five
individuals were involved, therefore, Shaw's account of
four or five men running up to the victim is consistent
with the account of the other witnesses.  In addition,
Shaw's statement does not indicate that anyone remained
in the car when the assault took place.

Given the evidence against petitioner at trial, it
is unlikely that Shaw's statement would have made a
difference, as he provided varying accounts of the

32

events, initially in a police report and later in an
undated statement.  Therefore, it is likely that
defense counsel's decision not to call him at trial was
a strategic one and does not constitute ineffective
assistance of counsel.

VII. Other Allegations of Ineffective Assistance of
     Counsel

      In his brief dated June 7, 2005, petitioner
asserts other grounds for ineffective assistance of
counsel, but fails to set forth with any specificity
the facts upon which the claim for relief is based.
...

      The claims of ineffective assistance, individually
and collectively, do not support an entitlement to an
evidentiary hearing.  Accordingly, petitioner's
application for post-conviction relief is DENIED.

(Letter Opinion at 6-14 (Superior Court of New Jersey, Law

Division, Mercer Vicinage May 16, 2006).)

      The Appellate Division affirmed the denial of relief

"substantially for the reasons expressed by Judge Smithson in his

May 16, 2006 written opinion."

      The Counsel Clause of the Sixth Amendment provides that a

criminal defendant "shall enjoy the right ... to have the

Assistance of Counsel for his defence."  U.S. Const. amend. VI.

The right to counsel is "the right to _effective_ assistance of

counsel."  McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)

(emphasis added).

      To prevail on a claim of ineffective assistance of counsel,

a habeas petitioner must show both that his counsel's performance

fell below an objective standard of reasonable professional

                              33

assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. Strickland v. Washington, 466 U.S. 668, 687, 694 (1984).  A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."  Strickland at 694. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.

The performance and prejudice prongs of Strickland may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed."  Id. at 697.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  Id. at 690-91.  If counsel has been deficient in any way, however, the

34

habeas court must determine whether the cumulative effect of counsel's errors prejudiced the defendant within the meaning of Strickland.  See Berryman v. Morton, 100 F.3d 1089, 1101-02 (3d Cir. 1996).

Here, the state courts correctly identified and applied the controlling Supreme Court precedent.  Petitioner is not entitled to relief on this claim.

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  No certificate of appealability shall issue.

35

V.   <u>CONCLUSION</u>

For the reasons set forth above, the Petition will be denied.  An appropriate order follows.

_____
Anne E. Thompson
United States District Judge

Dated:

36